## BERKS COUNTY.

JULY TERM, 1882.   No. 111.                    FEBRUARY 28, 1883.

# Moore's Appeal.

1. Where a husband in failing health was kindly treated by his wife, but, in her absence, was induced to leave his home by unwarranted representations of his relatives that she intended to put him in an insane asylum, and she, thereupon, under the belief that it was at least doubtful whether he intended to return to her, removed to her own house and they never thereafter lived together, it was not such a desertion upon her part as would prevent her from retaining three hundred dollars from his estate, under the act of April 14, 1851.

2. Where the testimony does not warrant the conclusions of fact reached by an Auditor, his finding will be set aside.

Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

Appeal of Ellen Moore, widow, from a decree of the Orphans' Court of *Berks County*, confirming an auditor's report upon the account of Isaac Slichter, executor of the last will and testament of John T. Moore, deceased.

The account of the executor was referred to B. F. Y. Shearer, as auditor, to make distribution and report. The auditor reported, *inter alia*, as follows:

"In November, 1874, John T. Moore and Ellen Moore, his wife, lived at No. 330 Washington street, Reading, Pa., in a house owned by Mr. Moore. On the twenty-fifth of the same month, he went to the country to Isaac Slichter, his brother-in-law, in Robeson township, this county, and, as it seems, though not distinctly so stated, for his health. He stayed there a little over a week—nine days—during which time he sent word to his wife about his health, and also sent her some money. He also sent her word when he was coming home; of this she was promptly informed. When he came home, at the time appointed, he found that his wife had left his house with all her furniture and things, leaving his things in his own house. He immediately gave the following notice in the *Reading Eagle* and *Times and Dispatch:*

'NOTICE.—Notice is hereby given that my wife, Ellen Moore, has left my bed and board without any just cause or provocation, and I caution all persons trusting her on my account from this date.

JOHN T. MOORE.'

[Moore's Appeal.]

He then made his home with his daughter Nora, who lived on Pine street, in the same city, where he remained up to the time of his death, in January, 1876, and his wife living in her own house in the same city, less than a mile away. During all this time he was sickly. She never called to see him. She supported herself.

Shortly before his death, he made a will, a copy of which is hereto attached, in which he says: 'It is my will that my wife shall have what the law will allow her out of my estate.' The effect of the will with regard to the rights of the widow is the same as though he had died intestate. During almost fourteen months immediately preceding his death, they lived separate and apart, without any family relation existing between them. There certainly is not sufficient evidence in the case to establish a desertion on the part of John T. Moore. In fact, none at all. Was their separation from some temporary or accidental cause, or from the fault of the testator? 'If so,' says Judge Agnew in Hettrick v. Hettrick, 5 P. F. S., 293, 'she is entitled to the $300.' In the opinion of the auditor, the separation was too long and too persistent to have been either temporary or accidental; nor is it claimed to have been such by the exceptant. Was it then from the fault of the testator? The question now arises, What would have justified her in separating from her husband? Let us see. Judge Black, in Breinig v. Meitzler, 11 H., 160, says: 'If she did not go by his command, it must be proved that she could not stay with safety. Mere want of sympathy, disagreeable manners, ebullitions of ill temper, habitual disregard of her feelings, refusal to protect her from the insults of others—all these, though nearly as brutal as blows, are not to be taken as just cause for separation.' There is nothing in the case to show that he commanded her to go, nor that she could not stay with safety. Personal violence, whether actually inflicted or only threatened, would be sufficient. But in all the testimony taken by the auditor nothing is said about personal violence; nor are threats of any kind proved. It is true she did not know anything of his going to the country, but this cannot have given her sufficient cause for leaving him, as he promptly informed her of his whereabouts, his state of health, the time when he was coming home, and also sent her some money. When he came back from the country, he at once treated her as having deserted him, by giving notice in different newspapers. This accusation she never refuted, never attempted to refute, but acquiesced in it until after

the time of his death. She never went to see him, although he lived but a few squares away, and yet while he was sick. According to the testimony of Joseph Slichter, (see p. 19, App.,) she expected him to follow her ; this he was not obliged to do. The counsel for the widow cited Terry's Appeal, 5 S., p. 344. In that case the husband had deserted his wife, and she had never voluntarily relinquished the family relation between them. But in this case the widow deserted him, and that without sufficient cause, and voluntarily relinquished the family relation. This, in the opinion of the auditor, precludes her from claiming the $300."

To this finding, the widow, Ellen Moore, filed exceptions, *inter alia,* as follows :

3. The testimony taken before the auditor clearly shows that John T. Moore, under the influence of his relations, deserted his wife ; that her treatment of him up to the moment he was taken away from the house was of the kindest and most affectionate character, and that his leaving was without the slightest cause on her part. It is too plain to be controverted that the decedent's relations, believing he would soon die, conspired together to get rid of the wife, in order that the children of the first wife might share his whole estate. Knowing her kind attention to her husband, these conspiring relatives were doubtless apprehensive she might become the sole beneficiary of his estate.

5. The auditor egregiously erred in not allowing to this exceptant the benefit of the $300 law, as claimed and demanded from the executor.

The Court below, SASSAMAN, J., March 17, 1881, dismissed the exceptions and confirmed the report, saying :

"I have examined all the papers in this case. With the findings of fact in a contested case like this, the Orphans' Court cannot interfere, as the auditor is in a much better situation for that work than the court would be. Under the law, I do not see that the auditor is in error."

The widow then appealed, assigning as errors the dismissal of the exceptions.

The testimony upon which the decision of this court was based sufficiently appears in the opinion filed.

*A. K. Stauffer, C. H. Ruhl,* and *J. H. Jacobs* for the appellant.

The auditor entirely misconceived the facts and blundered into erroneous conclusions.

*John Ralston* for the appellees. Appellant voluntarily relinquished conjugal intercourse with her husband, and removed from his domicile without cause, more than one year before his decease, and did not offer to return and resume those relations; did not even visit him or inquire as to his health and condition during that period. Hence, as no family relations existed between herself and husband at the time of his decease, under the ruling in Odiorne's Appeal, 54 Pa. S. R., 175, she is not entitled to receive $300 out of her husband's estate.

May 25, 1883, the opinion of the Court was delivered by Mr. Justice STERRETT.

If, instead of finding that appellant deserted her husband without cause, the learned auditor had found that the latter, through the evil influence of mischief-making relatives, was persuaded to leave his home under circumstances calculated to induce his wife to believe he did not intend to return, his conclusions of fact would have been more in accordance with what appears to be the weight of the evidence.

The circumstances under which appellant's husband was induced to leave home are detailed by one of the witnesses, Mr. Hummel, to whose store he was taken immediately before he left the city. "His son and two of the Slichters got me to go there to Moore's and get him to go with me to my store, that they had something to tell him. Mrs. Moore was not there when he went away with me. The Slichters told me before I went for him that Mrs. Moore was going to take him to the Insane Asylum at Harrisburg. I don't know whether I told this to Moore or not. I suppose they told him all about it when he got to the store, and that day he went along home with the Slichters to the country, and that is the last he and his wife ever lived together." On cross-examination, he says: "They wanted to let him know that Mrs. Moore was going to send him to the Insane Asylum at Harrisburg. I went for him: found him at home. I told him his son and the Slichters were over at the store and wanted to see him. He came along to the store. At the store I did not hear much of what they said. They went off in a carriage. I learned afterwards that he went to Isaac Slichter's, in Robeson township." Mrs. Brown testifies that she met Hummel and Moore on their way to the store; the latter was only partially clad, having neither vest, necktie, collar, nor "suspenders on, and had to hold his pants up with his hands. They were

walking pretty fast. Hummel was leading him. I asked Mr. Moore whether he was going away, and he said no, he would be back soon, he did not feel good. This was some time in November. It was cold. It was about three, P. M., when I met them going towards Hummel's store." The son referred to by the witnesses is a step-son of appellant, and the Slichters are near relatives of testator's first wife. The testimony shows that neither of these parties was so devotedly attached to appellant, testator's second wife, that they would be likely to take a very deep interest in her personal welfare. The testator was then, and for a long time before had been, in failing health. The unwarranted representation that his wife intended to send him to the asylum doubtless had its desired effect, and produced its legitimate fruit—estrangement of feeling. This is very evident from testator's statement to his cousin, Mrs. Bachter, a few weeks before he died. She says: "He told me he was sorry he ever went away from Mrs. Moore. He said he was taken away to the country, and he would have come back, but they told him she was going to take him to the insane asylum at Harrisburg, and that he didn't want to go there because he was not crazy. Hummel came after him and he was not dressed, nor fit to go; that Hummel told him that made no difference, he was just to go along to Fourth and Penn; then when he came down there the Slichter boys were there. Abe told him he was to go along with them to the country for a week; he said he was not fit to go, that his clothes were not clean, and his wife was not at home."

It is clearly shown by the testimony that prior to his leaving home, under the circumstances above stated, testator was kindly treated and cared for by his wife. In the language of one of the many witnesses examined on that subject: "She always treated him kindly, took care of him, and waited on him. She was always at home. I came there often unexpectedly. He often talked to me about his wife's kindness to him; that she treated him kindly. He spoke to me about this nearly every time I was there." Another witness, Mrs. Dallet, says appellant treated her husband "with all possible affection. She attended on him; waited on him faithfully. At times, he was very peevish and fretful. I never saw her unkind to him." Joseph Moore testifies he was often at his brother's house; "visited him up to the time of his leaving. He was kindly treated by his wife. Visited him also when he lived with his daughter. I always

[The City of Altoona *v.* James **H.** Irvin.]

thought he was treated better by his wife than by his daughter." Several witnesses testify substantially to the same effect, and there is no conflicting testimony on the subject. It is impossible to read the testimony without coming to the conclusion that appellant's deportment towards her husband was that of a kind and affectionate wife, prior to the time he was induced to leave home, under circumstances calculated to impress her with the belief that she would thenceforth be obliged to take care of herself. She doubtless acted unwisely in removing to her own house during his absence; but the testimony shows she did so not with the intention of deserting him, but because she had reason to believe that it was at least doubtful whether he intended to return to her; and when he did return, his conduct was calculated to widen rather than heal the breach he had occasioned. From an examination of the testimony, we are satisfied it did not warrant the conclusions of fact upon which the Court refused to allow appellant's claim. The decree must, therefore, be reversed.

The net balance for distribution is $502 98, of which appellant, as widow of the testator, is entitled to receive $300; testator's two children, G. W. Moore and Elenora Roland, each $67 66; and appellant the interest annually on $67 66 during her life, and at her decease, the principal to be equally divided between testator's two children.

Decree reversed at the cost of appellees, and it is now adjudged and decreed that the fund, $502 98, be distributed as above stated.